[Civ. No. 3804. First Appellate District, Division One.—February 24, 1921.]

In the Matter of the Naturalization of AUGUST HER-MANN SIELCKEN. CLARA SIELCKEN, Respondent, v. FRANCIS P. GARVAN, as Alien Property Custodian of the United States, Appellant.

[1] RESTORATION OF LOST RECORDS—PROCEEDING UNDER ACT OF 1906—RIGHT OF APPEAL.—A proceeding to restore a lost record under the act of the legislature approved June 16, 1906 (Stats, 1906, p. 73), is a special proceeding and a right of appeal exists therein, although the statute makes no provision therefor.

[2] ID.—RESTORATION OF NATURALIZATION RECORD—APPEAL—RIGHT OF ALIEN PROPERTY CUSTODIAN.—The alien property custodian of the United States is a party interested who has the right of appeal in a proceeding under the act of June 16, 1906, to restore a lost record of naturalization, where the purpose of the proceeding is to recover property from such official which was taken over by him during the recent war upon the theory that the owner was an alien enemy.

[3] ID.—EVIDENCE—COMPETENCY—WAIVER—CONSIDERATION ON APPEAL. In a proceeding to restore a lost record of naturalization, objection to the competency of evidence is waived by the petitioner, where admitted without objection, and such evidence may be considered on an appeal from the decree restoring the record in determining the sufficiency of the evidence to support the decree.

[4] ID.—RESTORATION OF DESTROYED NATURALIZATION RECORD—SUFFICIENCY OF EVIDENCE.—In this proceeding under the act of June 16, 1906, to restore the records of the district court of the fourth judicial district in the matter of the naturalization of a citizen, which records were destroyed in the conflagration of 1906, the evidence is sufficient to sustain the judgment of restoration.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Bernard J. Flood, Judge. Affirmed.

The facts are stated in the opinion of the court.

Knight, Boland, Hutchinson & Christin for Appellant.

John Francis Neylan for Respondent.

RICHARDS, J.—This proceeding was instituted by the petition of one Clara Sielcken, as the widow of one August Hermann Sielcken, directed to the superior court of the city and county of San Francisco, praying for an order restoring the records of the district court of the fourth judicial district of the state of California in the matter of the naturalization of said August Hermann Sielcken, alleged in her amended petition to have occurred in said court. The jurisdiction of said superior court to entertain said petition arises out of the fact that it became the successor of the jurisdiction and custodian of the records of said former district court under the provisions of the constitution creating said superior court and of the statutes expressly providing for such succession. (Stats. 1880, p. 23.) The proceeding itself was instituted under and in accordance with the provisions of section 2 of an act of the legislature approved June 16, 1906, entitled, "An Act relating to the restoration of court records which have been lost, injured or destroyed by conflagration or other public calamity." (Stats. 1906, p. 73.) The petitioner's application was filed in said superior court on October 20, 1920, and came on for hearing on October 23d of that year. At the inception of said hearing no person appeared to oppose said petition, and thereupon considerable evidence was presented to the court in support thereof without objection; but at a later session of said court held on November 3, 1920, one Francis P. Garvan, alien property custodian of the United States, appeared, alleging that as such official he had an interest in the determination of said matter, and he therefore at said time presented a complaint in intervention and asked leave to file the same. The further hearing of the matter was then continued until December 1, 1920, at which time the respective parties appeared, the petitioner to object to the

filing of said complaint in intervention upon the ground that the said complainant as such official was not a party in interest in said proceeding, and the said complainant in intervention to move to strike out all of the evidence theretofore presented by the petitioner upon the ground that the petition did not state facts sufficient to entitle the applicant to the relief prayed for. In making said motion the complainant in intervention expressly disclaimed making any objection to the competency of the evidence thus far presented, or to the fact it was in a large measure hearsay. The petitioner at this point amended her original petition in certain respects, and thereupon the court took under advisement both matters. The hearing then proceeded with the further submission of evidence both in support of the original and amended petition and in opposition thereto, to none of which evidence was any objection urged upon the ground of incompetency; and the cause having been submitted to the court for decision, it made an order permitting the complaint in intervention to be filed, and also made a further order denying the motion of the complainant to strike out the testimony on behalf of said petitioner, and thereupon made and entered its judgment granting the prayer of the petitioner for the desired relief. From such last-named judgment the complainant in intervention prosecutes this appeal.

[1] The first question presented upon this appeal is as to whether a right of appeal exists in a proceeding of this character. It is conceded that this is a special proceeding and that it is one in which no provision for an appeal is embraced in the statute which provides for such proceeding. Notwithstanding this fact, we are of the opinion that the existence of a right of appeal in proceedings of this character has been conclusively determined, so far as this court is concerned, by the decision of the supreme court in the recent case of *Application of Herman,* 183 Cal. 153, [191 Pac. 934].

[2] The next question presented for discussion is as to whether, conceding that a right of appeal exists, the appellant, as the alien property custodian of the United States, has such an interest in the result of this proceeding as to entitle him to take and prosecute such an appeal. We are of the opinion that this question has been determined, in

so far as this court is concerned, by the action and order of the trial court in permitting the appellant to file and present proofs in support of his complaint in intervention. Having been thus made a party to the record in this proceeding by an order of the trial court from which no appeal has been taken, we think the appellant has acquired sufficient standing thereby to permit the prosecution by him of this appeal, particularly in view of the fact that throughout the entire record herein it is made apparent that the purpose of the petitioner in seeking to have the lost record of her deceased husband's admission to citizenship restored is in furtherance of her prior and continuing effort to wrest from the custody of the alien property custodian of the United States that portion of the estate of her deceased husband which was taken over during the recent war by said official upon the theory that her said husband was an alien enemy.

This brings us to the only remaining question before this court for its determination upon this appeal. That question is whether there was sufficient evidence presented to the trial court to sustain its order granting the relief prayed for by the petitioner under the provisions of section 2 of the act of the legislature approved June 16, 1906, relating to the restoration of court records lost, injured, or destroyed by conflagration or other public calamity.

It is conceded that the records of the district court of the state of California in and for the fourth judicial district were destroyed in the conflagration of 1906, but it is contended by the appellant that there is no evidence in the record before us sufficient to sustain the findings of the trial court that there ever existed in the records and files of said court a record of a judicial proceeding wherein August Hermann Sielcken was made a naturalized citizen of the United States. Before entering upon the inquiry as to just what the record herein does contain touching more or less closely the question before us, it may be well to refer briefly to the statute which authorizes such proceeding. There are two sections in this statute relating to the restoration of lost or destroyed judicial records. By the first of these the record may be restored by the simple process of presenting to the court a duly certified copy of the original record. In the second section of the act, however,

it was apparently realized by the lawmakers sitting in extra session within a brief space of time after the great conflagration of 1906, that cases might arise wherein it would be impossible to procure either certified copies of the original proceedings or any exact evidence as to what the original record did actually contain; and in the presence of such a possibility section 2 of said statute was enacted, permitting parties seeking the restoration of lost judicial records to present such competent evidence as they might be able to produce as to the substance or effect of the lost or destroyed judgment or order. This is such a case. It has relation to the judicial record of the naturalization of an individual occurring nearly fifty years ago, the individual himself being deceased and, in all human probability, each and all of those who participated in the original proceeding as judge, clerk, witnesses, and spectators having likewise gone the way of all the earth. It is in the light of the situation which is thus presented that we approach a consideration of the evidence in the instant case.

[3] In so doing it is to be noted that the appellant has expressly waived any objection which he might have urged at the hearing in the trial court to the competency of any and all of the evidence produced on behalf of the petitioner, and to the fact that much of said evidence was hearsay. When evidence of this character has been admitted in the trial court without objection, it and also this court upon appeal may properly consider the same in order to determine whether the evidence as a whole is sufficient to sustain findings and a judgment or order of the trial court in the petitioner's favor. (*Smith* v. *Golden State Syndicate et al.*, 43 Cal. App. 346, [185 .Pac. 209].)

[4] Having thus determined, we take up the entire record before us for the purpose of discovering and properly weighing what it may contain touching the matter of the date and place of the naturalization of August Hermann Sielcken. There are certain unquestioned facts which stand forth upon the threshhold of this record having an important bearing upon the weight and effect of certain other proffered evidence. This initial evidence has reference to the character of the deceased August Hermann Sielcken and to his life-long conduct touching the matter of American citizenship. The record teems with proof that August

Hermann Sielcken, commonly known as Hermann Sielcken, was a man of the highest personal character and of a capacity approaching genius in the conduct of large, diversified, and widely extended business affairs. He came to the state of California a poor foreigner, almost an exile, from Hamburg, Germany, the place of his birth. He died in Baden Baden in 1917. Between these two dates he rose from a position of obscurity and poverty to be a merchant of international reputation, a several times millionaire, and a man of affairs, whose reputation for personal and business integrity extended to three continents. From a time dating back to the period of his early residence in California Hermann Sielcken began to deport himself as and to declare himself to be a naturalized citizen of the United States, and from that early date up to the hour of his death he consistently claimed and acted as a naturalized American citizen. He voted in national and local elections as such citizen while residing in the city of New York. He served upon juries for which citizenship was a prerequisite. He acted as a director of numerous corporations to which citizenship was an essential qualification. He traveled widely upon passports issued to him upon his declaration of his American citizenship. He was at his marriage and in the official records of each alliance certified to the fact that he was a citizen of the United States. He repeatedly asserted among his former friends and acquaintances, at home and abroad, that he was a naturalized American citizen. He was, in fact, very proud of his citizenship, even when a resident of Germany during the closing years of his life and when it would have been to his interest to have declared himself a citizen and subject of Germany. He acquired an extensive estate in Baden Baden, and, after having done so, being offered a title of nobility by the Duchy of Baden, conditioned upon his becoming a German citizen, he refused such title upon the ground that he possessed a higher title of nobility in the fact of his American citizenship. Over the portals of his home in Baden Baden he constantly kept displayed the American flag, while he adorned its halls with portraits of American Presidents and other distinguished citizens of the United States. Being in Germany at the time of the outbreak of the great war, and being detained there against his desire to return to

America, he steadfastly and courageously maintained that he was an American citizen, and frequently caused his assertion in that regard to be entered in the official records of the German empire. Upon the declaration of war between the United States and Germany he was listed by the latter as an alien enemy of Germany and as an American citizen, and his property in Germany was ordered seized by the German alien property custodian. In the year 1910 he was called as a witness before a congressional committee at Washington, D. C., and there testified under oath to the fact that he was a citizen of the United States and had been so for thirty years. In addition to such sworn declaration, he frequently declared to numerous persons that he had been naturalized while living in California, but that he had lost his naturalization papers' in the wreck of the steamer "Parana" off the coast of Brazil in the year 1877. In a word, there is not a scrap of evidence coming from his lips or pen in contradiction of this consistent course of conduct, oral statement, and recorded evidence tending to show that during the entire period of his life, from a time shortly after his arrival in California, Hermann Sielcken constantly and consistently acted as and asserted and believed himself to be a naturalized American citizen, and conducted himself uniformly as such in all the manifold relations of his active, extensive, and distinguished business career. From these evidences the inference is irresistible that Hermann Sielcken was in fact a naturalized American citizen and that he had been such from early in the period of his residence in the United States and while he was living within the state of California.

This brings us to the question as to when and where and by the action and order of what tribunal Hermann Sielcken was made an American citizen by the process of naturalization. The fact is undisputed that he first entered the United States in the year 1869, being at that time nineteen years of age, and arriving in California from Costa Rica; and that for the first two or three years thereafter he engaged in the business of traveling wool-buyer through various portions of California. During this period he entered the employ of R. Feuerstein & Co., being a firm of wool-buyers having their headquarters in San Francisco, and, according to his own statement, was required by said firm

to become an American citizen as a condition of his remaining in their employ. He further states in writing, though not under oath, that he accordingly made an application for naturalization to the courts of either Mendocino or Sonoma County. This statement has reference evidently to his intention papers, which he would have been entitled to take out after a two years' residence in California and which, in accordance with the expressed wish of his employers, he would have executed during those early years and while traveling upon their business in those portions of the state. However, he took up his settled residence in California in about the year 1873, according to the San Francisco directory of that year, and kept such residence until some time in the year 1875, when he went east for the first time, to accept employment in the firm of importers of which he afterward became and continued up to his death in 1917 to be a leading member. It was during this period of fixed abode in San Francisco that he would have arrived at his majority and would also have completed his five years' term of residence in the United States which would for the first time have entitled him to take out his final naturalization papers and receive from the court his order and certificate of naturalization. The record shows that he frequently thereafter asserted, both orally and in writing, that he was possessed of these naturalization papers, and that he lost the same in the wreck of the steamer "Parana" off the coast of Brazil in the year 1877. Notwithstanding the loss of these papers, he constantly and consistently thereafter, as we have seen, declared himself to be and conducted himself as an American citizen in all the affairs and relations of his business, social, and personal life.

From these undisputed facts, with which the record may fairly be said to be filled, but one reasonable and natural inference can be drawn, which is that August Hermann Sielcken was naturalized during the year 1874 or 1875 while residing in the city of San Francisco, and by the action of a court of record in said city having jurisdiction to confer naturalization upon him. The statutes of the United States during that period required that persons seeking naturalization should make their final application therefor in the district in which they resided. The inference

51 Cal. App.—35

as thus fortified is aided by evidence of a fruitless examination of the records of Mendocino and Sonoma Counties for the purpose of discovering a record of the first or final naturalization papers of Sielcken, if such ever existed there; and is also aided by the report of one Becker, showing a like fruitless investigation of the records of the federal district court of this district relating to naturalization. The district court of the state of California in and for the judicial district which embraced the city and county of San Francisco was the state court of record, which was invested by act of Congress with jurisdiction over the subject of naturalization. The trial court, by a rational process of elimination, and after a careful consideration of all of the evidence which this record contains, drew the inference and reached the conclusion that Hermann Sielcken had taken out his final naturalization papers in that court, and hence that a record thereof existed therein prior to the eighteenth day of April, 1906, which record, being destroyed by the conflagration of that day and year, might be restored as to its substance and effect under section 2 of the act of June 16, 1906, relating to the restoration of lost or destroyed judicial records. We are unable to say that the inference thus deduced and the order thus made are not sufficiently supported by the evidence in the case.

It follows that the judgment of the trial court should be affirmed, and it is so ordered.

Kerrigan, J., and Waste, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 25, 1921.